# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4840-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.F.L.,

     Defendant,

and

A.T.F.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.L.E.L.F.,

     a Minor.

_____

     Submitted April 21, 2020 – Decided May 8, 2020

     Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cape May County, Docket No. FG-05-0001-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Kathleen Gallagher, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.T.F. (Alex)[1] appeals from a June 21, 2019 Family Part order terminating his parental rights to his daughter, J.L.E.L.F. (Jennifer). The child's mother, D.F.L. (Diane), executed an identified surrender on August 22, 2018, and has not appealed. We find no merit in Alex's appeal and affirm.

---

[1] We use fictitious names for A.T.F., D.F.L., J.L.E.L.F., and the resource mother to protect their privacy and for ease of reference. See R. 1:38-3(d)(12).

We recount the most significant evidence to lend context to the analysis that follows.  Jennifer was born in November 2004.  On December 21, 2004, the Division of Child Protection and Permanency (Division) received a referral that Diane presented at a hospital under the influence of drugs.  Diane mentioned she had a child but could not remember where the child was.  During the Division's investigation, Diane admitted "that she used Ecstasy, marijuana, heroin, and [O]xycontin two days [before]" and was not addressing her post-partum depression.  Alex admitted to alcohol use.  Both defendants admitted to episodes of domestic violence.

The Division found that the allegations of neglect were substantiated because the

> [i]nvestigation revealed that both parents placed [Jennifer] at risk of harm by their drug [and] alcohol use and domestic violence.  [There was] [a]lso [a] concern [Diane] wasn't addressing her post[-]partum depression.  [Diane] admitted to drug use [and domestic violence incidents].  [Alex] admitted to alcohol use and [domestic violence incidents].  [Jennifer] was removed by Dodd.[2]  [The] [c]ase [was] to be opened to provide services.

---

[2]  A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.21 to -8.82.

On December 23, 2004, the Family Part judge upheld Jennifer's removal and ordered both defendants to comply with services to address their substance abuse and domestic violence issues.

After initially not complying with services, Alex ultimately completed Level I treatment at Family Addiction Treatment Services and an anger management program. On August 19, 2005, Jennifer was reunified with both parents, and Alex was designated her primary caregiver. On October 5, 2005, the court entered an order terminating the litigation.

In December 2005, Alex moved to Florida. On March 31, 2006, the judge ordered both parents to continue shared legal custody of Jennifer but designated Diane as the parent of primary residence. In June 2006, Alex was awarded four weeks of visitation with Jennifer in New Jersey. However, without court approval, Alex exercised parenting time with Jennifer in Florida from November 18, 2006, to January 7, 2007, and April 2007 to May 2007.

In August 2007, the Division received another referral regarding Diane. It was reported that Diane had an altercation with a security guard in Atlantic City after he requested that she remove then two-year-old Jennifer from the casino floor. In response, Diane rammed Jennifer's baby stroller into the security guard, with the child in it. The Division removed Jennifer from Diane's

custody because she was "mentally unstable and not fit to care for a small child at [that] time."

Alex sought custody of Jennifer, and the Division requested that the Florida Department of Children and Families (DCF) assess his home. After learning that Alex had pending domestic violence charges in Florida, the Division required him to undergo additional treatment. Thereafter, Alex successfully completed anger and stress management as well as substance abuse services in Florida.

In December 2007, Alex regained custody of Jennifer, and she went to live with him in Florida. On February 26, 2012, Florida DCF removed Jennifer from her father's care after a domestic violence incident occurred between him and his paramour. Alex choked his paramour until she was unable to breathe. Jennifer witnessed the event and screamed. A neighbor helped Jennifer escape out the window. Alex was arrested as a result of the assault on his paramour, and Jennifer was placed in a resource home.

Several months later, Florida DCF received a report that Jennifer engaged in "aggressive sexualized contact" with another girl in her foster home. During the Florida DCF investigation, Jennifer denied a history of sexual abuse, but disclosed that her father climbed into bed with her naked on two separate

occasions. There were also previous reports of Alex beating Jennifer, splitting her lip open with a belt, and leaving bruises on her legs.

Florida DCF developed a case plan, attempting reunification with one of Jennifer's parents as the primary goal, and adoption as a concurrent goal. Diane was required to visit Jennifer regularly through the ICPC[3] in order to facilitate reunification. Additionally, Diane was required to complete a parenting program, partake in therapy and mental health treatment programs, pay child support, demonstrate financial stability, and undergo substance abuse treatment.

Similarly, Alex had to visit Jennifer regularly and was subject to the same requirements as Diane. Additionally, Alex had to refrain from using corporal punishment, obtain stable housing, and enroll in a domestic violence evaluation and counseling program.

By July 2012, Diane successfully completed her home study, complied with services, and claimed she was committed to having Jennifer returned to her care. Alex was deemed "not compliant" in August 2012 by Florida DCF because he failed to provide required documentation and did not attend a battering intervention program or psychological evaluation. In September 2012, Alex was only "partially compliant" because he delayed completion of his Florida home

---

[3] Interstate Compact on the Placement of Children, N.J.S.A. 9:23-5.

study. Based upon the Division's recommendation, in September 2012, Jennifer was returned to Diane's custody in New Jersey.

Between October 2012 and May 2013, Jennifer underwent individual and family counseling. In February 2013, Jennifer told a Division caseworker that she missed her father and wanted to see him but preferred to live in New Jersey with her mother. Jennifer also advised the caseworker she did not want to speak to her father by phone "because she [was] still afraid of him."

Alex remained noncompliant with Florida DCF services. Therefore, the Division worked toward permanently placing Jennifer with her mother. Consequently, Florida DCF terminated its case in June 2013, and in August 2013, the Division closed its case. Jennifer was permanently placed with her mother. The child had no contact with her father from 2012 to the time of trial in 2019 except for one isolated visit in 2014, intermittent text and phone contact, and their mutual participation in a bonding evaluation in 2018.

On September 22, 2014, the Division received a referral from Alex that Diane was physically abusing Jennifer. The allegation was unfounded. Nonetheless, the Division continued to provide trauma-focused therapy for Jennifer to address her "adjustment disorder with anxiety" stemming from the physical abuse she endured as a child.

A-4840-18T3

On December 27, 2016, Diane reported to the Division that Jennifer disclosed Alex sexually abused her on two occasions when she was six or seven years old. On one occasion, Jennifer claimed Alex touched her vagina with his finger, and another time, he took her hand and made her touch his penis. Alex denied the allegations. After Jennifer underwent a New Jersey CARES evaluation and made the same disclosure to the examiner, the Division substantiated the allegation. That finding was later changed to "not established" when Alex appealed the determination and Jennifer refused to testify against him.

On May 17, 2017, Alex notified the Division that a text exchange with Jennifer led him to believe Diane was deceased. State Police investigated his claim and reported Diane was alive but had to be transported to the hospital for a psychological evaluation after experiencing a manic state. The next day, the Division conducted a Dodd removal of Jennifer after Diane was involuntarily hospitalized. Jennifer was placed with Amy, her current resource parent and godmother. On May 23, 2017, the removal was approved by the court.

The Division filed a complaint for custody. Jennifer expressed to her caseworker that she did not want to live with her father "because she [did not]

know if he [would] abuse her again." She spoke to him by phone, supervised by Amy.

In July 2017, Alex advised the Division caseworker that he completed domestic violence, parenting, and drug and alcohol programs in Florida. On August 30, 2017, the judge ordered Jennifer and Alex to temporarily cease contact so Jennifer could engage in trauma-focused therapy related to the alleged sexual abuse, as recommended by her therapist. Additionally, the judge ordered the Division to facilitate an ICPC home study with Alex in Florida. The Division made multiple requests for the home study and fingerprinting of Alex and his household members.

In December 2017, Alex informed the caseworker that he could not complete the ICPC process because his paramour's mother, who resided with him, was terminally ill and unable to comply. By letter dated December 11, 2017, Alex's home study was terminated. The letter explained: "The [S]tate of Florida is submitting a [d]enial home study regarding the aforementioned child. This placement has been denied, due to [Alex] not cooperating with the home study process."

On January 17, 2018, the Division advised the judge that Alex's home study was denied. Alex requested that the process be reinstated and a second

ICPC home study was submitted in March 2018. Alex expressed he was "willing to cooperate with the . . . process." However, on May 16, 2018, Florida denied the home study again due to Alex's lack of cooperation. Consequently, the Florida welfare agency could not evaluate and assess the services Alex needed or refer him to local providers. In the interim, the Law Guardian represented to the judge that Jennifer "did not want to go to Florida and was fine with not having any contact with [Alex] . . . ."

On May 23, 2018, the judge approved the Division's goal of adoption by Amy, Jennifer's resource mother. The judge interviewed Jennifer that day and she expressed that she "did not want to go to Florida to live with [Alex] nor did she want to have visits with him."

On July 3, 2018, the Division filed a complaint for guardianship, seeking to terminate Alex and Diane's parental rights to Jennifer. At the August 22, 2018 conference, Diane executed a voluntary surrender of her parental rights to Amy. In December 2018, Alex traveled to New Jersey to undergo a psychological evaluation and bonding evaluation by Dr. James L. Loving. Dr. Loving also conducted a bonding evaluation between Jennifer and Amy. Jennifer told Dr. Loving that she wanted to remain with Amy.

Dr. Loving noted Alex "pose[d] a number of critical risks in his role as a parent" based upon his history of domestic violence, physical abuse and alcohol dependence. The expert diagnosed Alex with alcohol use disorder, antisocial and narcissistic personality traits, anxiety, adjustment disorder and depression. Based on his bonding evaluations, Dr. Loving found Jennifer was "extremely anxious and uncomfortable" when discussing her father, and that she "[felt] close, safe, and comfortable" with Amy. Dr. Loving opined that Alex could not provide a safe and stable home for the child.

From February until June 2019, Judge M. Susan Sheppard conducted a trial on the Division's guardianship complaint. Dr. Loving and caseworker Jessica Davis testified for the Division. Dr. Loving testified that if Jennifer was returned to her father's custody, it would suggest a risk for sexual abuse and emotional invalidation for the child.

The caseworker testified that Alex pled guilty to battery in 2013 and spent 164 days in jail resulting from a domestic violence incident. Additionally, the caseworker testified that alternative relative placements for Jennifer were ruled out after background checks. Two other potential placements were not interested in caring for the child. Alex testified on his own behalf, and Jennifer,

age fourteen at the time, testified for the Law Guardian, who supported the termination of Alex's parental rights.

Judge Sheppard filed a written opinion dated June 21, 2019, in which she found the Division satisfied, by clear and convincing evidence, all four prongs of the "best interests of the child" test for termination of parental rights set forth in N.J.S.A. 30:4C-15.1(a). The judge memorialized her decision in a judgment of guardianship also dated June 21, 2019. This appeal followed.

II.

On appeal, Alex argues that the Division failed to establish prong three of the "best interests of the child test" under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Alex specifically claims the trial court's findings are inadequate to support a judgment terminating his parental rights. He argues that the judge erred by finding the Division made reasonable efforts to provide him with services needed to help him correct the circumstances that led to Jennifer's placement in foster care.

A parent has the constitutional right to raise his or her children. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). However, that right is "tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or

12

may be seriously endangered by a neglectful or abusive parent." Ibid. (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102 (2008)).

Accordingly, the Division may petition the court for an order terminating parental rights in the "best interests of the child" and must establish the four criteria enunciated in N.J.S.A. 30:4C-15.1(a). The criteria "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). It is a fact-sensitive inquiry. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (2007).

When a parent contests the termination of his or her parental rights, the court's function is to decide whether the parent can raise the child without causing further harm. In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "The burden falls on the State to demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." Ibid.

The scope of our review of a trial court's judgment terminating parental rights is limited. M.M., 189 N.J. at 278. We must uphold the trial court's factual findings if they are supported by substantial, credible evidence in the record. F.M., 211 N.J. at 448-49. Furthermore, findings by the Family Part as to witness

A-4840-18T3

credibility are entitled to deference because of its expertise in family matters and because it is better able to evaluate the veracity of witnesses who testified before it. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014).

Prong three requires the Division to establish that it "made reasonable efforts . . . to help the parent correct the circumstances which led to the child's placement outside the home" and considered alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). The reasonableness of the Division's efforts is not measured by whether they were successful in bringing about reunification of the parent and child. In re Guardianship of DMH, 161 N.J. 365, 393 (1999).

Here, Judge Sheppard found the Division made reasonable efforts to assist Alex in correcting the circumstances that led to Jennifer's placement outside the home. The judge pointed out that the Division attempted to provide Alex with services through ICPC multiple times.

However, Alex was largely non-compliant with ICPC's requests, resulting in a denial of services. Moreover, although Alex claimed he fulfilled all necessary services, the judge noted there was no proof that he completed anger management and substance abuse treatment. He also reneged on his promise to provide documentation and a signed release for his records to the Division. The

judge further found that the Division had considered alternatives to termination of Alex's parental rights.

On appeal, Alex argues that the only services provided to him by the Division after Jennifer was removed from her mother in May 2017 were updates on how the child was doing in foster care, and the psychological and bonding evaluations performed in anticipation of the guardianship trial. He also contends the two ICPC requests to Florida were the only efforts the Division made to ascertain what services he needed to reunify with Jennifer. Lastly, Alex asserts the Division failed to encourage and nurture his relationship with his daughter.

The record shows, however, that the Division provided Alex an extensive array of services spanning over a decade during its lengthy involvement with this family. He refused to cooperate. Alex received evaluations, classes, and other services addressing his substance abuse, anger issues, domestic violence, parenting skills, and other problematic areas.

Notwithstanding the history of treatment, Dr. Loving concluded that Alex displayed "poor insight and near-categorical denial," a "[l]ack in any real responsibility-taking or internal motivation to behave different[ly]," and "has an extremely poor prognosis for addressing his parenting-related risks, even if . . . give[n] more time and the opportunity to participate in new services . . . ."

Judge Sheppard found that Alex "made inconsistent or contradictory statements" during his testimony. The judge concluded that Alex was incredulous, and was "combative and evasive" when answering questions posed by counsel.

After interviewing Jennifer, the judge found she was "an extremely mature, articulate, and credible young lady." The judge concluded Jennifer feared her father and that her testimony about his physical and sexual abuse was credible.

In addition, the record supports Judge Sheppard's finding that the Division considered alternatives to termination of parental rights and that no such placement exists. The Division exercised due diligence and tried to find an alternative placement for Jennifer. Alex's contention that the Division failed to consider alternatives to termination of his parental rights is entirely without merit.

We conclude there is sufficient credible evidence in the record to support the judge's findings on prong three.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4840-18T3